In re CONSUMERS' COFFEE CO. (No. 2.)

(District Court, E. D. Pennsylvania. July 6, 1908.)

No. 2,252.

1. BANKRUPTCY — RECEIVERS — CONTINUING BUSINESS AT LOSS — RECEIVER'S LIABILITY.

Where a receiver in bankruptcy persisted in carrying on the bankrupt's business, under a former order of the court, when he knew the business to be unprofitable from the beginning and capable of being conducted only at a loss, he should be surcharged with a portion of the loss sustained.

2. SAME—SURCHARGING ACCOUNT.

Where a receiver in bankruptcy did not account for the proceeds of the sale of certain fixtures belonging to the bankrupt, his account should be surcharged for that amount, but not with the value of supplies which

the bankrupt had on hand at the time the receiver was appointed, and which were used up in continuing the business, in the absence of proof that the money derived from the use thereof did not appear in the receipts with which the receiver was charged; nor should he be charged with the difference between the appraised and sale value of fixtures, furniture, etc., of another place of business, operated by the bankrupt.

In Bankruptcy.

The following is a copy of the referee's report, referred to in the opinion:

A petition in bankruptcy was filed against the Consumers' Coffee Company on May 18, 1905, and on May 19, 1905, a petition was filed asking for the appointment of a receiver. At the time of the filing of the said petition, the bankrupt was conducting two restaurants, one at 519 Market street, and another at 236 Chestnut street, and the petition praying for the appointment of a receiver asked for an order for leave to continue the restaurants as going concerns. At the hearing, the court appointed Claude P. Chew receiver and authorized him to "continue the business of the said Consumers' Coffee Company as a going concern until further order of this court." Acting under said order, the receiver continued the business at both restaurants, and in July, 1905, he presented his petition to the judges of the District Court reciting the fact that the business at 519 Market street was being conducted at a loss, that there was no prospect of securing a purchaser for it as a going concern, and praying for leave to sell it at public sale. An order of sale was thereupon entered, and on July 24, 1905, the court confirmed the sale of the business at 519 Market street for $635. Although the receiver was unable to secure a purchaser for the business at 236 Chestnut street as a going concern, and the business at that place had lost money during the first six weeks that it was conducted by him at the rate of about $150 a week, and although experience seems to have taught the receiver that it was inexpedient to continue the business at 519 Market street any longer, he made no effort to dispose of the business at 236 Chestnut street by obtaining a similar order of sale. Nor did he in any way present the facts of the situation to the court or to the creditors for the purpose of obtaining instruction and relieving himself of the responsibility of continuing a business which had up to that time lost almost as much money as the entire appraised value of its assets. The receiver continued to conduct the business at 236 Chestnut street for nearly nine months longer, to wit, until March 30, 1906, losing money uninterruptedly during every week of that period; the losses averaging over $100 per week and amounting to not less than $60 in any one week.

On April 9, 1906, an adjudication in bankruptcy was entered against the Consumers' Coffee Company, and the matter referred to me as referee. On May 1st the first meeting of creditors was held, and John S. Hershey appointed trustee. On the same date the receiver presented a petition praying for an order to sell the business at 236 Chestnut street at private sale for the sum of $700. The receiver alleged in his said petition that, "owing to his being unable to carry on the business without entailing further loss, he was compelled to abandon the business of renting (running) a restaurant and was unable to obtain a purchaser for the same as a going concern." A special meeting of creditors was held on May 15, 1906, for the purpose of considering the said petition, and, there being no objection thereto, the petition was approved, and an order made accordingly. On July 26, 1906, one of the creditors presented a petition for an order on the receiver to file his account, upon which petition an order was entered on the same date that "Claude P. Chew do within ten days of the service of a copy of this order upon him file an account and report as receiver of the above estate." To this order no attention was paid. Thereafter, to wit, on October 3, 1906, a second petition was presented praying for an order on said receiver to show cause he should not file his account forthwith, and thereafter on October 12, 1906, the account was filed. It thus appears from the record that the receiver allowed more than six months to elapse from the time that the last moneys of the estate came into his hands before he filed his account.

At the time of his appointment as receiver, the said Claude P. Chew was employed in the credit department of N. Shellenburg & Co., and by reason of the duties of his said employment he was unable to give his full time and attention to the business of conducting restaurants. He visited the restaurant at 236 Chestnut street from day to day, sometimes giving it a mere perfunctory examination, and at other times staying there for several hours. The former manager of the bankrupt corporation was continued by the receiver as manager of the business and practically left in uncontrolled charge of the money of the business. The manager was the only one who compared the waiters' checks and the cash in the register from day to day. No written record was kept of the business, except a so-called cash book in which the receiver noted the daily receipts from the cash register. The waiters' checks have disappeared, and, as comparison of these checks with the cash in the register was left entirely to the manager of the business, the receiver appointed made no effort to assure himself of the correctness of this comparison, or the honesty of the manager. The moneys which the receiver took from the business from day to day were used in part to make cash payments on account of merchandise used in the business, and the balance was deposited by the receiver in his own private bank accounts, one of which was kept in his own name, and another in his name as attorney for his wife. There was no separate account kept by him as receiver either in one of the depositories designated by the court, or in any other bank. The cash book of the receiver was crudely kept, without any of the care which should, above all, be exercised by one who handles other people's money. The receiver knew that the business was losing money from the very first week during which he took charge, and that it was losing money continuously. He alleged that he kept up the business during the summer of 1905, notwithstanding the fact that he was losing money, in the hope of meeting with better success in the fall. When he found there was no improvement in the fall, he determined to make an application for a liquor license by using one of the employés of his business, one John Smith, as the applicant, after having a verbal understanding with him that, if the license were granted, it should be sold, and the proceeds used for the benefit of the bankrupt estate, and the applicant or lessee to be engaged as an employé of the business. How he expected to carry out his agreement does not appear. An application for a license was actually made, and in March, 1906, heard and refused. In the meantime the receiver permitted the expenses of the business to run on unchecked. He did not reduce the force of employés or their salaries, and his management, or lack of management, continued unchanged. He had known from the very beginning of his receivership that the business was an unprofitable one and an undesirable one. He had the opinion of experienced restaurateurs in Philadelphia, to some one of whom he had hoped to sell the business. None of them, however, would take it because, as the receiver testified: "They did not think that it was a good thing." There were other restaurants in bankruptcy in Philadelphia in 1905. Yet with all this information at hand, and with the knowledge that he was steadily losing the money of the creditors and with the persons who were dealing with him on the faith of his official position as receiver, he continued to carry on the business upon his own responsibility in the loosest manner, without books, and without proper supervision of his moneys, and he now seeks refuge behind the original order of the court which authorized him to "continue the business as a going concern until a further order of this court." Can it be possible that the judges of the District Court meant to authorize this man to continue a business from May, 1905, to March, 1906, at a known average weekly loss of $100, without proper account books or records, with an officer of the bankrupt corporation in control of the moneys, without a proper bank account or separation of his private funds from the moneys of the receivership? To ask the question is to state the answer. It was the duty of this receiver to present a report to the court promptly as soon as he saw the drift of affairs, especially as, in this case, there had been no adjudication, and no referee was in charge of the matter. The referee as a rule makes it his duty to watch the progress of the estate, and where there is a business being conducted he is, by virtue of his position, brought in personal contact with the receiver or trustee and is able to keep himself advised of the prog-

ress of the business and to judge of the desirability of continuing it. But the receiver appointed by the judges of the District Court stands in no such relation to the court. The judge, by virtue of his office, is not thus brought into personal contact with the receiver and can receive no information except that which comes to him from the records of his court. The receiver is free to act as he pleases, bound only by his sense of duty and honesty and the fear of punishment for misfeasance. It is then that he is called on to exercise certain qualities—good judgment, ordinary prudence, reasonable common sense. This receiver did not only use ordinary good judgment, prudence, and caution in the administration of his trust, but showed almost entire absence of these qualities. He carried on the business at the expense of people who were dealing with him and who relied upon his official position as receiver of the court as sufficient assurance that they would be paid the money due them. He incurred obligations amounting, according to his own statement, to upwards of $5,000. He failed to do things that an honest and efficient receiver should have done. He mingled the funds of the estate with his own, he kept no proper books and records, he allowed irresponsible people to handle his cash practically unchecked, and altogether managed the estate, not with the care expected of an officer of the court, but with the recklessness of a speculator. It is difficult to understand the conduct of the receiver in this case, except upon the theory that he was enjoying some secret benefit out of the estate, or that he hoped in some way to profit by it. It is true that he states that he did not receive one cent for his services, and that he accounted for every dollar of the moneys that came into his hands. There is no way of testing the accuracy of his statements, because he made no proper records of his transactions at the time. The cash book presented by him to-day is of no higher value as evidence than his own oral testimony. I am not prepared to say that this receiver has improperly taken any of the moneys of the estate, but I do not hesitate to say that he has put himself in a position in which such a presumption must inevitably arise. However, it is not because of misappropriation he is asked to be surcharged, but because of mismanagement, and of this there can be no doubt. The facts of this case are of such a nature that I find it unnecessary to consider the general legal propositions submitted to me concerning the duties of a receiver. It is easily possible to reach the conclusions in this case per saltum that the receiver has grievously failed in the performance of his plain duty.

It has been suggested by counsel for the creditors that the receiver be surcharged with the losses at 236 Chestnut street from July 7, 1905; that being the date on which he presented his petition for an order of sale of 519 Market street. At that time he had been conducting both restaurants for six weeks. He knew that the restaurant at 236 Chestnut street was losing money at the rate of upwards of $150 a week, he had made ample inquiry to satisfy himself that the place was an undesirable one, and it was his duty at that time to present the matter to the court and ask for an order of sale. That he recognized this to be his duty in the case of the restaurant 519 Market street is in itself a sufficient indication of his ability to judge the situation in a reasonable and prudent way. The fact that he failed to exercise this judgment makes him liable for the result. I am of the opinion therefore that the receiver should be surcharged as follows:

(1) With the losses incurred in the business (according to the expert accountant's report) from July 7, 1905, to March 30, 1906 .................................................... $3,919 51

(2) With the value of the supplies on hand at the time of his appointment as receiver (as per appraisement) ........... 213 63

(3) With the amount realized by him from the sale of fixtures at 519 Market street.................................... 635 00

(4) With the depreciation in the value of the fixtures, furniture, dishes, etc., at 236 Chestnut street, being the difference between the amount of their appraised value, to wit, $1,244.34, and the amount for which they were sold by the receiver, to wit, $700.00 ........................... 544 34

Total ................................................ $5,312 48

See 151 Fed. 933.

Henry N. Wessel, for creditors.

James S. Alcorn, for receiver.

J. B. McPHERSON, District Judge. After an attentive examination of the evidence offered before the referee (D. W. Amram, Esq.), I can see no reason for disagreeing with his findings of fact, and these findings afford a satisfactory basis for the conclusion that the receiver failed in his duty, and should be surcharged with some of the loss sustained by his improper persistence in carrying on a business which he knew to be unprofitable from the beginning. The referee's report, which is made part of this opinion, states the facts in detail, and I need not repeat them. My principal doubt has been whether the receiver should be charged with the loss from July 7, 1905, the date fixed by the referee, or from a later date in the fall after he had had an opportunity to learn from experience that the change of season would make no important difference in the business of the restaurant. After a good deal of reflection, I have come to the conclusion that perhaps it would be too harsh to charge him with the loss from July 7th, and I shall therefore modify this item so as to include the loss only from October 7th. The surcharge of $635, the amount realized from the sale of the fixtures at 519 Market street, is obviously proper, but I am unable to agree with the surcharge of the remaining two items. The supplies on hand at the time of the receiver's appointment, $213.-63, were presumably used up in conducting the business, and there is nothing to show that the money thus derived does not appear in the receipts with which he is charged. And I find no sufficient evidence to sustain the surcharge of $544.34, the difference between the appraisement of the fixtures, furniture, etc., at 236 Chestnut street, and the amount for which they were sold.

Thus modified, the report of the referee is confirmed.